[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 14280
APPEARANCES:
FOR THE PLAINTIFF:
 ROBERT N. OPOTZNER, ESQ. 148 Deer Kill Avenue, P.O. Box 440 Danbury, Connecticut 06813
FOR THE DEFENDANT;
 ANDREW P. NEMIROFF, ESQ. ERIC R. POSMANTIER, ESQ. 88 Field Point Road Greenwich, Connecticut 06836
FOR THE CHILDREN:
 MARVIN BOROFSKY, ESQ. 301 Main Street, P.O. Box 157 Danbury, Connecticut 06813
THE COURT: All right. From here forward the Court will order a transcript.
All right. This matter was tried over several days with a variety of witnesses being the plaintiff, the defendant, certain experts — Patrick Boyd, Frank O'Neil, Joe Eisen, Richard Proctor, Vincent Castiglia, if I'm pronouncing it correctly; and, also, lay persons and fact witnesses, including Gloria Wazniak, Michelle Adams, Sharon Halpin and, by deposition, Sara Zimmerman. The Court received, into evidence a large number of exhibits, as well as all of the testimony.
The Court finds it has jurisdiction over the marriage. One party has resided in the State of Connecticut continuously for more than one year prior to the bringing of this action.
Two minor children have been born to the wife since the date of the marriage who are issue of the marriage and that is Jordana, who was born on October 28th, 1993, and Rachel, who was born on October 13th, 1996. No other minor children have been born to the wife since the "date of the marriage. The wife is not currently pregnant. CT Page 14281
The parties have not been recipients of public assistance.
For reasons stated hereinafter, the Court does find that the marriage between the parties has broken down and has broken down irretrievably and that there is no reasonable hope of its reconciliation.
The Court has carefully considered the statutory criteria for issues of dissolution of marriage, custody, visitation, child support, alimony, assignment of interest in the assets and the liabilities of the parties, health insurance, life insurance and counsel fees; and, after considering the statutory criteria and the credible evidence and the facts as found herein, the Court has constructed the orders that will be entered.
The Court makes the following findings and notes the following orders that were entered pendente lite before various regional courts in this matter and the local court.
The parties successfully, to their credit, entered into a custody and visitation agreement, which this Court has reviewed and readopted on or about May 13th, 1999, which has been made orders of the Court and accepted by the Court, and the parties have been functioning with those orders on a pendente lite basis and have asked the Court to accept the agreement and make it the orders of the final dissolution of marriage.
The Court, having reviewed the agreement, does find it to be in the best interests of the minor children and, therefore, accepts the agreement. The parties have, also, entered into other stipulations and orders, which are relevant to the consideration of these proceedings.
On or about June 30, 1998, the parties entered into what I'm generically going to refer to as the automobile agreement; and in the automobile agreement, the defendant and, then, correspondingly, the plaintiff, were given the right to purchase or lease a car somewhere in the neighborhood of twenty-six thousand dollars with the payment not to exceed six hundred and one dollars and thirty-one cents per month and that payment was not to be considered as a basis for a modification of the pendente lite unallocated orders that were entered into this matter.
CT Page 14282 There is nothing that the Court has heard in the evidence of this matter to find that the application of that agreement would be unfair or inequitable to the proceedings before this Court.
The parties, also, entered into other agreements and/or had contested hearings that were Court orders that are relevant to these proceedings. The defendant was granted exclusive possession of the marital home as of approximately February 28th, 1997. At that time, a list of personal property "was promulgated, which the plaintiff was, by agreement and order, permitted to remove from the marital home to his personal possession outside of the marital home and that property was not to be considered nor remain in the home as a distribution or attempted division of the marital estate pendente lite, but was simply a owner — strike that — a control and possession issue on a pendente lite basis.
The Court finds that there is nothing in the evidence that has rendered that agreement subsequently unfair or inequitable to apply to the current proceedings.
The parties stipulated before this Court that, at the present time, they agreed that the minor children should attend private school and that no further evidence was required before this Court in regard to the necessity or need of private school education for the children so that this Court need not make a separate finding other than to accept the stipulation of the parties, which this Court does accept.
The parties, also, entered into a couple of other agreements and/or Court orders. The defendant — strike that — the plaintiff was ordered to pay ten thousand dollars per month as an unallocated alimony and support order to the defendant.
Certain assets of the parties were frozen. A certain Strong account was isolated out in the approximate amount of thirty-two thousand dollars for purposes of utilization for unreimbursed medical expenditures for the children and their private school tuition on a pendente lite basis.
The plaintiff was ordered to carry health insurance for the defendant and for the minor children on a pendente lite basis.
There, also, was a pendente lite agreement, freeing up thirty thousand dollars for fifteen thousand dollars each of counsel CT Page 14283 fees on a previous occasion.
These agreements and Court orders are highlighted because they help to provide the texture and pathway that the Court proceedings have brought the parties to the point where they were on trial before this Court. It's not meant to be exhaustive of every little court appearance. The Court noted that there were other interim agreements on certain issues — for instance, who was going to represent the children and things of that nature — and it was not the purpose of this Court to recite all of those agreements or Court orders.
The Court notes that the parties were married on August 28th, 1983 and that, therefore, effectively to the date of dissolution of marriage, this is a sixteen year marriage, although the Court is aware of the earlier filing of the dissolution complaint.
The plaintiff is Dr. Schmierer who was born on or about August 3rd, 1953 and is forty-six years old. There is a stipulation that the parties entered into, which was an exhibit — I believe its number is 110 — the number is not important — in which the parties stipulated that they were both in good health and, as to Dr. Schmierer, there was no health impediment to his earning capacity.
He received a Bachelor's from Temple in 1975 and his medical degree from SUNY in 1979. The parties, thereafter, met. The employment of Dr. Schmierer has followed a notable progression, in that he started with a fellowship in cardiology during the time of the parties' marriage, having first been an intern and resident before they were married at Cornell.
He, then, in 1984, came to Connecticut. He became Board certified in 1985, which provided him the opportunity and ability to hold himself out to the patient community as a Board certified cardiologist with a specialty of cardiology.
He was in solo practice in 1986 to 1987 after a brief period of time with two other doctors. Ultimately, in 1987, Dr. Schmierer joined the Office of Professionai Services at the Danbury Hospital and has been in their employ since that time as a cardiologist. He, also, accepted a teaching appointment at Yale University School of Medicine somewhere around the late 80's, early 1990's.
CT Page 14284 The employment of Dr. Schmierer with DOPS, which is the Office of Professional Services, is full time and demonstrates him in a full time capacity, working to his earning capacity and ability. He has, from time to time in the past, been able to earn additional income, which is not in any way significantly present at the present time.
He was involved with Physicians Health Services and was able to, in the past, to earn consulting fees up to thirty thousand dollars per year, which are no longer available to him — the services he having provided to that company are no longer in existence or necessary.
He has received a bonus in the past from DOPS. There is nothing in the evidence to suggest that he is currently in line for a DOPS bonus — the productivity requirements being significant for many individuals, other than self, outside of his ability to control. Therefore, the ability to receive a bonus being dependent on so many other individuals is not within his employment ability to control.
He, also, receives rent from his condominium where he sees patients, which is on a rent contractual basis with his employer, so that it covers the costs of the condominium and provides him an insignificant amount of income after payment of all expenses.
The Court had insufficient evidence to determine whether the rent charged is a fair rental or an arms length rental or simply a rental constructed to pay the expenses and reflects either an overpayment of rent, vis-a-vis market conditions, or an underpayment of rent, vis-a-vis market conditions. In any event, in the absence of evidence to the contrary, the Court determines that there is no further nonearning income capacity for Dr. Schmierer from that building at the present time.
The defendant is, also — this was the defendant's second marriage — strike that — the plaintiff's second marriage.
The defendant was born on September 22d 1957. She's forty-two years old and in good health.
The stipulation that was entered into, that was reflected and referenced in regard to the health condition of the plaintiff, is equally applicable to her and reflects a stipulation that her not working since her last working days at the Danbury Hospital is CT Page 14285 not a reflection of any impaired earning capacity or ability as a result of health and that, therefore, is not to be considered for those purposes. The Court accepts that stipulation.
The defendant completed less than one year of veterinary school and, then, chose to proceed with a degree in nursing. She's received a Bachelor's from SUNY and is licensed at the present time as an RN in Connecticut and has, in the past, been licensed in New York and Massachusetts. The evidence does not provide clarity to the Court as to whether the New York or Massachusetts license have been kept up or would require some kind of renewal.
She is an RN with a variety of expertises in acute and primary care and has worked for the vast majority of the marriage in her capacity as an RN.
The Court notes that her earning capacity as an RN, based upon the evidence before the Court, is somewhere in the range at the present time of twenty-five to twenty-seven dollars per hour, depending upon the terms and conditions that she sought employment and the nature of her application to that process on a steady or casual basis.
After the birth of Jordana, Ms. Schmierer continued to work and, then, did not work, after the birth of Rachel — the parties' second child.
The Court makes the following additional findings. The parties own a property at 9 Trailing Ridge in Brookfield. The Court has considered all of the evidence provided to the Court in regard to value. The Court has, "as a matter of law, the right and obligation to enter into an independent decision as to the value of that property. The Court finds the fair market value of that property at the present time to be four hundred and eighty thousand dollars.
The mortgage has a principal balance in the neighborhood of two hundred and nineteen thousand dollars, which provides a net equity, based upon subtraction of the mortgage only and no other considerations, in the range of two hundred and sixty-one thousand dollars.
The Court notes and finds that the mortgage had an original principal balance of three hundred and forty thousand dollars; CT Page 14286 and that, if it is paid in accordance with its tenor as its payments come due, will be paid in its entirety in the amount of — strike that — on the date of March 1, 2007. Both parties are obligated on the note, which is secured by the mortgage, on Trailing Ridge.
The plaintiff pendente lite purchased living accommodations for himself at 10 Westview Lane in Brookfield, Connecticut. The parties have stipulated — and the Court has no reason "not to accept the stipulation — of the value of that property at two hundred and eighty-seven thousand five hundred dollars and it is so accepted. It has a principal mortgage balance in the neighborhood of two hundred and twenty-two thousand six hundred dollars; and, therefore, based upon the mortgage alone, has a net equity of sixty-four thousand nine hundred dollars.
The Court will note for the parties that this Court did not worry about every dollar and cent but just the significant range of values.
There is an office condominium, which has already been referenced previously, which is located at 27 Hospital Avenue, Number 301, in Danbury. Title ownership, actually, was not provided in evidence to the Court. The Court is inferring that it is owned by Dr. Schmierer but, for purposes of the dissolution, it really doesn't matter how the legal title is held as long as that is remedied by the Court orders.
The Court finds the value to be a hundred and thirty-five thousand dollars. It has a mortgage balance of approximately ninety-nine thousand forty dollars for a net equity, after consideration of mortgage only, of approximately thirty-five thousand, thirty-six thousand dollars.
The plaintiff has an ownership interest by way of a partnership of sorts in the Diagnostic Center of Greater Danbury, whose major asset is the ownership of another condominium. The Court values its interest, based upon the limited amount of evidence before the Court, at six thousand six hundred and twenty dollars.
There are a variety of retirement funds in the plaintiff's 403-B and the valuation date of August 31st, 1999 is before this Court. It is in significant proximity of time to the dissolution of marriage and the Court accepts it as a valuation date. CT Page 14287
The Court notes and accepts the following values and will, for the parties, indicate the Court compared the values placed by each party on their financial affidavit. They're not significantly different as to any asset and reflects the give and take of the market from day to day as it exists.
Nationwide — sixty-five thousand eight eighteen; Lincoln Life, the first — seventy-six thousand seven seventy three; Lincoln Life, the second — forty-four thousand three eighty-six; Janus Funds — a hundred fifty-three thousand two hundred and twenty-four.
The plaintiff, also, has a Keogh with the Fidelity Mutual and the balance of thirty-two thousand one hundred and eighty; and an IRA with Fidelity Mutual and a balance of twenty-seven thousand nine hundred and eighteen.
The defendant, Miss Schmierer, has an IRA with Fidelity with a balance of twenty-four thousand oh four oh.
The plaintiff has a variety of life insurance policies but only three of the life insurance policies have cash value and the Court notes, pursuant to his uncontradicted testimony, that they result from gifts from his parents. He's got Mutual Benefit — two different policies, a Northwestern Mutual Life policy. The aggregate cash surrender value is thirty-seven thousand forty-seven dollars, as reflected on his financial affidavit.
There are eighty-eight thousand eight hundred dollars in accounts, which have been indicated to be segregated for Jordana. The Court finds that they have A not been, as a matter of law, set aside to Jordana by means of a trust — Uniform Gift to Minor Act account — or the like; and that, therefore, any segregation of those funds —
Recess. Thank you.
(Whereupon, the Court recessed for a fire drill.)
THE COURT: Well, thank you for your patience.
That was a fire drill, I'm told. It was planned.
Okay. What I'm going to do is just pick up where I left off, CT Page 14288 as I understand where I left off, and we'll take it from there and you'll find out whether I'm organized or not, won't you? I'm just teasing.
All right. The Court was discussing the assets that are collectively — have been — references children's accounts. The Court found that — made findings in regard to them. As a result of the accounts not being segregated and dedicated, as a matter of law, by trust or Uniform Gift to Minor Act or the like as accounts for the children expressly and explicitly and solely, they are treated as assets of the parties and subject to division under case law and statute and their values total eighty-eight thousand eight hundred dollars.
The plaintiff has a pension plan with Danbury Health Systems, Inc. It's a qualified plan and its value, as a lump sum, has not been presented to the Court in terms of any evidence. The Court has evidence of its value as a cash flow or a cash stream and that is all the Court can utilize for determination of a proper allocation of the parties' interests.
The single life annuity, based upon present day — in other words, if Dr. Schmierer were to stop working today but collect at retirement at sixty-five — is two thousand eight hundred and forty-six dollars and the joint survivor election would be two thousand five hundred and ninety dollars, each being per month.
There is a Uniform Gift to Minor Act account for Jordana at Fidelity, which is, apparently, properly set up as an UGMA account "and it's in the balance of five thousand seventy-one dollars and is treated by these orders as a gift that has been made and segregated to Jordana.
There are United States Savings Bonds in the balance of approximately one thousand dollars when matured and those are in the name of Jordana. The alternative payee beneficiary or trustee has not been presented to the Court.
The certain term life insurance, which as, probably, the parties and counsel know, has no cash surrender value, and so, therefore, no findings of value are made in regard to those but they represent present insurable interest for purposes of protection of child support and alimony orders.
The plaintiff has three bank accounts through checking and CT Page 14289 money market, which have an approximate balance of eleven thousand dollars. He has a 1995 Jeep Cherokee, which the Court finds a value to be fourteen thousand dollars.
The defendant has a 1998 Chevy Blazer, which is covered by the — what I'm going to call the automobile agreement — and that was entered PL and reflected by that agreement. The Court notes that she declares its value to be sixteen thousand four hundred and fifty dollars, which must — in some way, shape or form represent its value after depreciated from 1998 forward and taking it off the lot as well. The Court having no other information as to its value or evidence as to its value, while mindful of the fact that it's covered by the PL agreement, the Court is constrained and required, as a matter of law, to make findings of value and, therefore, for purposes of findings of value, that value is accepted and the Court notes that it has a loan on it of about thirteen thousand five hundred dollars.
The defendant has bank accounts with a fluctuating value as well and, at the time of the financial affidavit, had values of approximately three hundred dollars total.
There are certain U.S. Savings Bonds, which are assets of the parties, and, as of December of 1998, they had a matured face value of sixteen hundred dollars and a current value of approximately three hundred and seventy-five dollars.
There's a State of Israel Bond with an approximate value of five hundred dollars. The Court lacks evidence whether that's the matured value or the face value.
The parties have a joint CD with an approximate balance of nine thousand dollars. There is a Galaxy Money Market account previously referenced by the pendente lite order, which has been utilized to pay dawn tuition and medical expenses and that has a balance of approximately fourteen thousand six hundred and eighty-five dollars.
The Court notes that a certain Fidelity Brokerage account has a value, while is listed as a burden by an obligation of six thousand one hundred dollars, for purposes of payment of certain improvements to the marital home and that this has all been fashioned by the pendente lite Court, by order, there is nothing that the Court has heard in the evidence to suggest that this order has been rendered subsequently inequitable and, therefore, CT Page 14290 that order remains undisturbed by these proceedings.
Each party has personal effects, which the Court declines to find values of.
The household furnishings that are in the various homes did not render themselves to a finding of value. While there was evidence as to their presence and whether or not they were extravagant, costly, economical or bargain-minded, none of that evidence, when it's all said and done, provide the Court with a sufficient basis to make a finding of value as to the totality of the household furnishings. Specific items, such as Oriental rugs, the court did receive evidence about.
The Court notes that the evidence varied from item to item and that reasonable minds can differ as to the cost of something on purchase and the present value and that the Court has, ultimately, received insufficient evidence to make a finding of specific value of household furnishings in either home.
Each party, also, has their own personal effects, which includes jewelry, which the Court did not receive sufficient evidence on value to make findings of value.
The parties each had debts as listed on their respective financial affidavits. The amounts of the debts were not seriously challenged in the proceedings, just the enforceability or actual debt quality to some of the debts was the subject of proceedings. The Court accepts that the values placed on each parties' respective financial affidavit as to the debts asserted are proper values and, therefore, adopted by these findings.
The Court, specifically, declines to make a finding as to whether or not either of the parties are required, as a matter of morality, ethics, social circumstance or familial pressure to pay back their respective family members on the items listed as loans.
The construction of the language in each of these respective promissory notes would, in each occasion, appear enforceable on the face of them as legal obligations and the Court so notes. What happens to them on the circumstance of both Dr. Schmierer and Ms. Schmierer and their families is best left to some nonlegal proceeding. The Court has not, however, as to either of the circumstances of either the plaintiff or the defendant CT Page 14291 considered any of these loans to be so fiscally threatening or unsettling that the Court is concerned that either party is in jeopardy financially as a result of incurring these financial obligations to their respective family members.
The Court has the affidavits of debt and notes the — from both legal counsel and finds that each counsel is in good faith in the presentation of their respective affidavits of debt. The obligations on the respective affidavits of debt appear — and the Court finds — are real from the plaintiff to his counsel and from the defendant to her counsel; and the Court further notes that, from the payments made by each party to their present and previous counsel, have been substantial and reflect a willingness to pay at the rates charged and for the intensity and volume of service provided by counsel in attempting to aid and protect their respective clients and, therefore, the Court, based upon that evidence and the record, is constrained to find that the fees charged are commensurate with the expectations of the party in the community that they live in and that the complexity off the matter for the parties was sufficient, especially in light of the intensity of each of the respective parties of having an active interest in their awn dissolution process and, therefore, the Court will accept these fees charged by both counsel as commensurate with the expertise required by counsel so retained in their field of expertise.
The Court makes the following additional findings. The plaintiff's social security, based upon present earnings, at age sixty-two will provide retirement income of twelve hundred dollars per month; at age sixty-six — sixteen hundred and twenty-five dollars per month and at age seventy — two thousand one hundred and fifty-five dollars per month.
The defendant's own social security, based upon her present earnings, at age sixty-two will provide four hundred and seventy dollars per month; at age sixty-six and a half will provide six hundred and forty-five dollars per month; and at age seventy will provide eight hundred and twenty-five dollars per month.
The Court notes that the parties have been married in excess of ten years; and, therefore, based upon current social security guidelines and regulations and the current earnings of the plaintiff, the defendant, as the former spouse of the plaintiff for in excess of ten years, would have an entitlement of social security in lieu of her own, if she so elects, in the amount of CT Page 14292 one thousand five hundred and eighty-five dollars monthly at full retirement age.
The Court finds that the defendant's work as a primary care nurse in a variety of settings in acute medical and surgical settings have provided her with significant expertise in an area that society seems to have a continuing need for; and that the plaintiff, with his expertise in cardiology as a Board certified physician, provides him as well a work experience expertise that society has a continuing need for; and, therefore, both of them, if and when working to their maximum, have no expectation that external community interests would result in them not being employable as, for instance, many of our factory workers find from day to day and from time to time.
The plaintiff has worked throughout the marriage and has always taken the position throughout the marriage that the defendant may work by her choice if she so desires, but that, based upon his earning capacity and ability, it was the defendant's choice unto herself as to whether to seek employment and, as previously indicated, she worked on a part-time basis until being at home with two children — one a newborn and one a toddler.
The second child, Rachel, has been presented to the Court as a child with perhaps special needs. I've never been clear on what special needs means but the Court notes and finds that Rachel's developmental needs, based upon the evidence before the Court, requires an increased level of attention and investment of time, energy and emotional support from her parents and that the result of the Court orders is that the defendant is her primary parent.
This support is to assist Rachel in the steady progress necessary for her to continue to improve her eye focusing, range of vision, not necessarily intensity of vision — her tactile gross motor skills and her verbal expression skills to help her prepare and understand her role as a developing youngster in a very busy world.
The Court "further makes the following findings. In regard to the marriage between the parties, the Court notes the parties have spent an extraordinary amount of time litigating the cause of the breakdown of the marriage.
Some day, counsel, before I start a trial, I'm going to read CT Page 14293 the statutory criteria so that the parties become increasingly sensitive to the fact that cause is one factor and so that when they give you your marching orders in terms of proof, they understand that there are a variety of factors which the Court has been referencing throughout these findings — that the Court must consider in the property division and alimony issues.
The Court makes the following findings, some of which are functioned as negative findings. The Court does not find that the defendant's shoplifting caused the breakdown of this marriage. The Court does not find that the defendant's fashioning of furnishings for the home caused the breakdown of this marriage. The Court does not find that the plaintiff's interest in finances or long hours spent in his study reading or at the computer terminal caused the breakdown of this marriage. These are all stressors upon a marriage.
The court finds that "both parties — Dr. Schmierer and Ms. Schmierer — while suffering some emotionally from these stressors in the marriage, from the loneliness that each might have felt and from the emotional turbulence that came from their interactions, may have felt that these stressors did not cause the breakdown of this marriage — that each party remained committed to finding a way to continue in this marriage, to make this marriage work and to, ultimately, live long lives as a married unit together.
The parties have both inferred that they come from families that stay together and both have shown, through their testimony, deep affection for the families from which they have come and a certain caring for each other's families, and the structure that Dr. Schmierer and Ms. Schmierer had did not suggest that they should lightly abandon their enterprise of marriage and so they remained committed to it, although there were stressors, difficulties, intentions within the marriage, including some disappointments that perhaps this enterprise was not quite the same as they had hoped for on the day they took their vows.
The commitment to this marriage enterprise by both of them is reflected by the decision to have both children. The rationalization offered by Dr. Schmierer that, in any case, Jordana would have needed a sister and so, even if he was on his way out of the marriage, it was important to have Rachel, is — and the Court finds — a post hoc, Monday morning, twenty-twenty hindsight justification. This Court finds that the conduct of CT Page 14294 both of the parties in having a second child was a continuing commitment to them in attempting to live long lives together as a married family.
The Court notes that the parties, in early '96, endeavored to sell their home and buy another lot to build a new home. These are not insignificant acts and, also, reflect that the enterprise of building the first home and decorating it could not possibly have been so terrible, so awful and so acrimonious that even the thought of doing it a second time would become unacceptable if it were. Indeed, the parties went down the road and started that process.
Perhaps it was with the hope of a second child and a new fresh start that this all was being structured but it was a process being structured by both parties in the continuing effort and hope to save their marriage and continue it until they were old and gray together.
The Court finds that both of the parties did contribute to these tension-filled moments that made their marriage something less than ideal from day to day and month to month. However, the Court must, when being constrained by both parties to consider it, find that the fault for the breakdown of the marriage is primarily the plaintiff's.
The Court finds that the plaintiff was not credible in his explanation of the purpose of his purchases at Victoria Secret and the Court finds that the plaintiff was not credible in observing his demeanor when he testified to the nature of his telephone conversations with Pat Nadeau repeatedly over the long evening hours. The Court found that the witness, Michelle Adams, was credible before the Court.
Therefore, on issues of credibility as between the plaintiff and the defendant, where their testimony is in direct conflict, the Court, having found the plaintiff not credible on these issues, casts the same pallor of doubt as to his testimony on conflictinq issues surrounding the date and times for his involving with Pat Nadeau.
The Court finds that, at the very least, the plaintiff was emotionally committed to Pat Nadeau during the last months of the defendant's pregnancy and that it is this emotional commitment and the desire to follow through on a physical commitment to Ms. CT Page 14295 Nadeau that, ultimately, caused the breakdown of this marriage, caused him to abandon the persevering efforts to work in his marriage and it caused the defendant to abandon a sense of trust or hope in him as a partner.
The Court makes further findings. The Court notes, first of all, that the defendant wishes stay home with her children in the child rearing years. The evidence supports her assertion that she was never required by the plaintiff to work during the marriage.
While the Court notes that her earning capacity remains in place, as indicated by prior findings, it is not advisable at the present time for her to invest herself in employment outside of the home at times when she should be able to attend to the children when they are at home, when they need attending to because they are sick. She needs to be available to them as needed and asserted to by them. She needs to be available to them when the children are not, by the custodial agreement, in the care of the plaintiff.
The Court further finds and notes that the plaintiff's earning capacity and ability to acquire future assets is significantly greater than the defendant's, as reflected in these findings. The income of the plaintiff, for purposes of present income and the Court's finding of earning capacity, is as properly reflected in his financial affidavit; and that his income with DOPS, as a gross income, is in the three hundred thousand dollar range and that, that is absent hopes of bonuses by the plaintiff, which this Court will not rely on. That is the income that the Court considers for purposes of the proceedings here.
The plaintiff presented evidence, "over objection, as to the affordability and eligibility of the defendant for a refinance of the mortgage on the marital home. The Court notes, first of all, that, that mortgage has a principal balance which will, if paid off in accordance with its tenor, be paid off in seven years and seven months. The evidence was as of the date that was provided. It may well be six months but the difference is not terribly significant except for the amount of the principal that would be amortized over the one month payment, which is somewhere in the range at two thousand dollars per month at the present time.
The Court is aware that mortgage interest is front loaded on mortgages and has received expert testimony to that effect. It CT Page 14296 has, also, received the amortization table to take judicial notice of, which the Court commends counsel. There's a loan progress chart on the back of an amortization table which shows you the progress of the loan from which you can infer and compute how much interest is being paid by seeing the progress of the payoff of the principal; and, indeed, in regard to the mortgage presently on the marital home, the interest was front loaded and, therefore, most of the interest was paid and it explains why the principal is paying down so quickly at this point in time.
The testimony received in regard to mortgage refinance eligibility was received over objection. It presents an interesting legal issue. The Court need nor reach it, however. The Court finds that, in structuring the financial orders in this matter, that it is not equitable under the statutory construction and case law considerations to entertain requiring the defendant to attempt to refinance the marital home. The Court leaves — strike that — the note and mortgage on the marital home — not refinancing the marital home itself. The Court leaves for another day — and perhaps for another Court — the argument as to whether or not, all things being equal, if a different conclusion were reached, whether the Court has the authority to do so or whether, under circumstances similar to this, it received sufficient information to do so. It need not be reached here.
The court further makes the following findings. The trusts and life insurance trusts that were alluded to, and presented evidence in regard to, have not been considered for purposes of distribution, assets or interests of the parties under these orders.
Their respective positions "as trustees is not found to render them in a position by itself to be the recipients of any determinate amount of money now or in the future and, therefore, it does not satisfy the Rubin criteria.
The Court notes that the defendant has received past gifts from her mother, which have been given by her mother, in her sole discretion from a certain Zimmerman shelter trust and that, actually, they are funds payable to her that she has chosen to pass on, in her judgment, to Ms. Schmierer and to her brother. She was frank in her testimony — that she decided to hold it up while the divorce was going on.
CT Page 14297 The payments are not required as a matter of law. They are totally discretionary with her. They are, therefore, not unlike a Will in the sense that she can tell you one day that, well, when the divorce is over, I'll renew the payments — which she has not told the Court, in her testimony nor has it been proven — but change her mind from day to day. That's why, for instance, evidence as to the contents of revocable documents such as Wills, is not allowed before the Court. Such an intent is revocable.
So the question becomes whether the track record of the two years' gifts and the availability of the nongifted years' funds for purposes of loans, for attorney fees to Ms. Schmierer is sufficient evidence for this Court to find that these are recurring gifts — that the Court should factor in as information for allocation of a proper interest in regard to child support, alimony or property settlement.
The child support one is taken care of the easiest and so the Court will address that separately. The new guidelines, which still apply in terms of the guidelines, even if the parties exceed the numbers, make clear that recurring gifts would need to — in some way, fashion or form — change the parties' lifestyle and these are not that significant; but, in any case, in regard to child support — and the Court includes that in the following findings, as well, in any case — alimony and property settlement, this Court cannot find that the gifts have the texture of a complete history or an absolute intent or willingness to continue these gifts, such that the Court can rely upon them in fashioning relief and orders here and, therefore, they are not so considered.
The Court makes the following orders — well, strike that. I have one more finding to make.
The presumptive minimum child support under the guidelines for two children combined between both parties' obligations is five hundred and sixty-six dollars per week and this is the cap out of a two thousand five hundred dollar per week combined net weekly income. The guidelines provide that the child support ordered, as the combined support order and the parties' respective share, cannot be below those amounts without finding a deviation under the appropriate deviation criteria.
All right. Now, the Court makes the following orders. The Court orders a dissolution of the marriage. The parties, by CT Page 14298 agreement. have agreed to cooperate in the procurement of a GET, G-E-T, and are ordered, therefore, pursuant to their agreement to cooperate in seeking and procuring the GET. The record should reflect the GET is a Jewish divorce.
The Court has already accepted the custody and visitation agreement and orders of May 13th, 1999. They're made orders of this Court and they're ordered incorporated within these orders.
The Court orders that the plaintiff shall have the dependency exemption for Jordana until calendar year 2009. Thereafter, the dependency exemption shall be the defendant's.
The defendant shall have the dependency exemption for Rachel throughout her minority and on in time as allowable to claim it under federal law.
The Court orders the plaintiff to pay child support to the defendant in the amount of two thousand nine hundred seventy dollars per month for support of the two minor children in accordance with the statutory provisions. What that means for the parties is — so that you know — is you pay until the child is eighteen for children unless the child is unmarried, full time resident in the receiving parent's home and still a full time student in high school and, then, you pay until the high school education is complete or age nineteen is reached, whichever is first.
The parties having entered into the stipulation in regard to private school, the Court orders the following — that the Galaxy Money Market account and the joint CD be held by the parties as tenants in common and that the private school tuition costs be paid first from the Galaxy Money Market account and, when it is depleted, then, from the joint CD, and, if private school ends before the funds are depleted, the balance of the funds shall be divided equally between the parties.
If private school continues after the funds are depleted, then, each party shall pay one-half of the costs associated with the private school, which means the required sums for enrollment by the school, which are typically tuition and mandatory fees and costs charged by the private school for enrollment.
If the parties choose to board their children at private school, it would include those associated charges as well. CT Page 14299
The defendant is entitled to her COBRA rights — health insurance, I should highlight for you, excuse me — health insurance now. The defendant is entitled to her COBRA rights under the plaintiff's policy at her cost, although the plaintiff is required to cooperate with her receipt and processing of the paperwork which, if required, shall include paying the first month's premium and, then, being reimbursed for the same so that the time line for it is not lost.
The plaintiff shall maintain health insurance for the minor children as it is available through his employment or as it is available to him at reasonable cost so long as he is obligated to pay child support.
The Court will deviate from the guidelines in regard to health expenditures because of the asset structure and division and because it is required by equity. The guidelines — since the Court is required to find what the guidelines would find, the guidelines would result somewhere around — and it's a moving target because of the nature of the parties' finances — but somewhere around a ninety/ten or an eighty-five/fifteen split and that is what's being deviated from, and the parties are each ordered to pay one-half of health expenditures for the minor children not paid by insurance. Health expenditures shall be broadly construed to include, but not be limited to, all reasonable and necessary medical, dental, hospital, orthopedic, optical, ophthalmological, optometric, orthodontist expenses and the like for the minor children.
The Court, in its deviation, , specifically does not order the plaintiff — strike that — the defendant to be responsible for the first one hundred dollars per year per child, which is provided for in the guidelines. The deviation deletes that portion of the guidelines for this family.
Alimony — the plaintiff shall not receive any alimony from the defendant. The plaintiff shall pay periodic alimony to the defendant as follows: eight thousand three hundred and thirty-three dollars per month, intending to be one hundred thousand dollars per year, as periodic alimony until September 1, 2008, at which time, it shall reduce to five thousand dollars per month until September 1, 2012, at which point it shall terminate absolutely.
CT Page 14300 It shall terminate earlier upon either party's death, upon the remarriage of the defendant and/or, in the discretion of the Court, upon the cohabitation of the defendant with an unrelated male under 46b-86b, if the Court finds that such alimony should be terminated as a result of the circumstances of cohabitation as defined by case law and statute in terms of the alteration to the financial needs of the defendant.
If the Court finds that such cohabitation should not result in termination but should result in modification, including suspension, that is intended to be a part of the cohabitation order herein. The periodic alimony is nonmodifiable as to duration only.
The plaintiff has a variety of life insurance policies — some term, some whole — previously alluded to, in a face amount aggregate of one thousand one hundred and fifty thousand dollars. He currently maintains them and, therefore, the Court finds that there is no insurability risk as maintained presently and as offered in terms of the group by his present employer.
The Court finds that the premiums are reasonable and affordable, based upon the evidence and the financial affidavits. These findings are made to comport with Lake versusLake.
The Court orders that the plaintiff maintain that life insurance in the face amount of one thousand one hundred and fifty thousand dollars and not borrow up his cash values anymore than any loans are currently on them at the present time. However, commencing on the fifth anniversary date from the dissolution of marriage, he may reduce the coverage and aggregate by a total of the amount paid for alimony and child support for the month previous.
Property division — the office condominium at 270 Hospital Avenue, number 301, Danbury shall be the plaintiff's absolutely. If a deed is necessary, the plaintiff shall quitclaim all of her — strike that — the defendant shall quitclaim all of her right, title and interest in and to that property within the next thirty days. If she signed on the mortgage note, which there was no evidence on one way or the other, the plaintiff shall indemnify and hold her harmless in regard to the note and shall pay it in accordance with his tenor as it comes due.
CT Page 14301 Plaintiff is the sole owner of 10 Westview Lane, Brookfield, and its contents. He is the sole owner of his interest in the Diagnosis Center of Greater Danbury. These are all free and clear of any claim of the defendant.
He is the sole owner of the following assets of his 403-B. His Nationwide account in the approximate balance of sixty-five eight eighteen; his Janus funds account in the approximate balance of a hundred and fifty-three two twenty-four; and his Fidelity Mutual IRA in the amount of twenty-seven thousand nine eighteen. He is the sole owner of all the cash value of the two Mutual Benefit Life Insurance policies and the Northwestern Mutual policy.
The parties have a variety of stocks, bonds, and mutual funds. The Court's orders make certain orders of division of them. If an account number is not listed as the Court lists them after, it is because the party who's getting that account — there's only one account listed there. For instance, there's only one Harbor Fund, so there's no need to give account numbers or is getting all of the accounts from that particular fund and, therefore, there's no need to list them. That explanation will become apparent as I go through the orders and clearer perhaps.
The defendant — strike that — the plaintiff shall be the sole owner of the contents of the Harbor Fund; the Evergreen Fund; the Artisan Fund; the PBHG Growth Fund; the Oakmark Fund; the Strong Fund — 0414100161189; the T. Rowe Price Fund — 700025951-1; the T. Rowe Price Fund — 101385427-1; the Mutual Discovery Fund; the Montgomery Fund; the Kaufman Fund; Vanguard Fund, number one; Vanguard Fund, number two; and Vanguard Fund, number three; the Scudder Fund; the U.S. Savings Bond with a face amount of sixteen hundred as of 12/98.
He is the sole owner of his debts as listed on his financial affidavit and, to the extent necessary, shall indemnify and hold the defendant harmless on them. He is the sole owner of personal property and jewelry already in his possession at his condominium office or at his personal residence.
He's the sole owner of his 1995 Jeep Cherokee and any paperwork necessary to effect the same shall be signed by the defendant. He's the sole owner of his bank accounts and checking and money market in the approximate aggregate of eleven thousand dollars. CT Page 14302
The defendant is — strike that — the plaintiff is ordered to transfer to the defendant by quitclaim deed within thirty days of today's date all of his right, title and interest in and to the property at 9 Trailing Ridge in Brookfield. The defendant shall indemnify and hold him harmless on the note and mortgage on the same and shall pay it as it comes due in accordance with its tenor.
The defendant shall receive — and is the sole owner from the plaintiff's 403-B — the Lincoln Life of seventy-six thousand seven seventy-three; the Lincoln Life of forty-four thousand, three eighty-six; the plaintiff's Keogh Fidelity Mutual of thirty-two thousand one eighty; her own Fidelity IRA of twenty-four thousand forty; the following stocks, bonds and mutual funds — Fidelity Mutual Fund, Account Number T050537202; Strong Fund, Account Number 0323200149274; T. Rowe Price, Account Number 101279148-7; Mutual Beacon, Account Number 779185711.
Now, before I go on, let it be clear that this Court purposefully, in allocating the funds, the 403-B accounts, the stocks, the bonds, did not split up the contents of any fund, bond or account. Theoretically, this is to the mutual benefit of both parties from a tax planning point of view but, in any case, it will stand as such.
These bonds and accounts and mutual funds all fluctuate from day to day. The Court accepted the values as listed and, perhaps, referenced in these orders but whatever the value is on the day you get it is the value. Neither party is to look to the other for makeup of a diminished value resulting from market conditions or look to the other as a result of an appreciation as a result of market conditions. Of course, it remains without saying that neither party is to take any funds from either party's funds — simply effect the paperwork for the transfer of ownership interest.
In regard to the plaintiff's pension at Danbury Health Systems, Inc., the plaintiff is ordered to elect joint survivor annuity for the pension and the defendant to cooperate in the same. The defendant is named the alternate payee for fifty percent of the plaintiff's pension interest as of October 13, 1999. However, if a valuation date is required that is separate from the date of dissolution of marriage by the plan administrator, that shall be September 30th or October 1, CT Page 14303 whichever is acceptable to the plan administrator. If the plan administrator has no taste as to the same, then, it's October 1 — closer in date to the dissolution of marriage.
The Court has declined to name the defendant as a survivor beneficiary under the joint survivor option. The Court orders that the documentation for these orders shall be effectuated by a qualified domestic relations order. The QDRO shall be prepared by defendant or her designee and that the cost of preparation shall be born equally by both parties. The Court will retain jurisdiction over the qualified domestic relations order for purposes of its effectuation in accordance with the tenor of these orders only.
The defendant further shall be the sole owner of her 1998: Chevy Blazer with a loan thereon and, to the extent necessary, indemnify and hold the plaintiff harmless on that debt; her bank accounts in the approximate amount of three hundred dollars; jewelry in her possession and her own debts as shown on her financial affidavit; and she shall, to the extent necessary, indemnify and hold the plaintiff harmless on the same.
The following additional orders are necessary regarding assets and liabilities of the parties. Notwithstanding the assignment of ownership interest in the Fidelity account of 157214264, the six thousand one hundred dollars, previously ordered by pendente lite order to be used for home improvements at the marital home, shall be so utilized and segregated for that purpose.
The Court is not aware of who the custodian is on the U.S. Savings fond for Jordana or her UGMA account. Whoever is the custodian shall remain the custodian and shall account to the other party — annually to the other party. The Court is aware that the plaintiff, in his claims for relief, asserts that he's the custodian but I can't take the claims for relief as evidence and so these findings are made accordingly.
The Court orders in regard to the funds generically listed as children's funds in the amount — amassed amount or eighty-eight thousand eight hundred and seven dollars that the plaintiff shall be the sole owner of the PBHG Growth Fund of those funds and the Strong Growth Fund of those funds and the defendant shall be the sole owner of the Strong common stock of those funds and the Artisan's funds. CT Page 14304
The Court is going to make the following notation for purposes of effectuation of that order. It would appear by the way they're listed on the financial affidavit that the two Strong components, while being divided by the Court — one to one party and one to the other — are part of the same account. Since the Strong accounts — since each party will walk out of this divorce with different Strong funds, the Court does not believe it will be an insurmountable block to the effectuation of these orders to segregate the common fund to the defendant and the growth fund to the plaintiff.
If it is not permitted by Strong to do so, then, if the parties cannot agree on their own as to how to effectuate the complement of that by one party compensating the other, then, both the growth fund and common stock fund will be and are, as part of these orders, ordered sold, the tax consequences taken off the top and the funds split. This is the only fund that the Court is making orders of that, as listed in the way described in the financial affidavit, provides the Court pause and concern as to whether and how to effectuate the title transfer.
In regard to personal effects and household furnishings, if the plaintiff can locate the father's Cartier watch in his possession, he shall do so and make diligent search and return it to the defendant.
If the defendant — strike that — the defendant shall make diligent search of the marital home for the Menorah purchased by the plaintiff's parents in Israel, any remaining Father's Day or birthday cards received by him from his folks or the children, his personal books and those clearly marked as his personal books and shall gather them up, with his grandmother's wall dresser, and make them available to the defendant — strike that — to the plaintiff within sixty days.
The defendant shall gather up all of the family photos and videos and the plaintiff, at his election, may copy them at his cost. She shall have them available to him within thirty days and he shall return them within thirty days of receipt. If the parties are distrustful of each other in regard to this issue, then, they can number them and refer to them generically so that they know what is in each other's hands.
Attorneys fees — the plaintiff has a residual attorney's fee CT Page 14305 bill of twenty-two thousand eight hundred and twenty-six dollars. He shall pay his own attorney's fees.
The defendant has a residual attorney's fee bill of seventy-four thousand three hundred and fifty-two dollars. To require her to pay her own attorney's fees in full as well would do violence to the financial fabric of the orders entered in the mosaic here and the intent of the Court to provide for her present and future needs.
The Court is confident that the plaintiff can pay his own attorney's fees without allocating some of the responsibility to the defendant. The Court is not confident that the defendant can do the same in total. The Court orders, therefore, that the plaintiff without — strike that — can do so in total without doing violence to the structure of these financial orders. The plaintiff is ordered to pay counsel fees of the defendant to the defendant's counsel in the amount of thirty thousand dollars on or before January 15th, 2000. The Court has carefully considered the mosaic of these orders and the crafting of these financial orders would be undermined if this counsel fee order were not entered.
The Court is aware, however, that a not insignificant amount of effort at this trial has been pointed towards alimony issues and that it would be just and proper for the Court, therefore, to construe this additional thirty thousand dollars being paid as counsel fees — that twenty thousand dollars of it be paid as a result of, and in the nature of, alimony advice having been provided and counsel having been provided by the defendant's counsel to her — it, therefore, being the intent of the Court that this item be considered as such for purposes of tax considerations when the plaintiff files his return.
Counsel, do you think I missed anything?
ATTORNEY OPOTZNER: Just a couple of questions, if I might, Your Honor.
THE COURT: Sure. Can I have some water while I listen.
ATTORNEY OPOTZNER: Your Honor, I have some.
THE COURT: Thanks.
CT Page 14306 (Whereupon, there was a brief pause in the proceedings.)
ATTORNEY POSMANTIER: Your Honor, while they're speaking, can I just ask the Court to see the most recent pleading file? I do not have with me a copy of our proposed orders, at my own fault.
THE COURT: I have no idea where it is and I've got —
ATTORNEY POSMANTIER: It's not here.
THE COURT: — to tell you — actually, I know that both of your proposed orders are in that big mess I gave you. It wasn't — unless you cleaned up what I gave you this morning, it's in with the exhibits. I know both of them are.
ATTORNEY POSMANTIER: Thank you, Your Honor.
THE COURT: Okay, cause I took it all last night. Go ahead, Mr. Opotzner.
ATTORNEY OPOTZNER: Judge, I have a — I have a couple of questions and, then, I think there's a factual issue I want to raise as well.
I tried to follow your allocation of the — of the accounts and I was — when I see the transcript, I will know better about those but the first question I have, Your Honor, is on the payment of the child support and the alimony. I don't know if you stated the commencement date and I wanted to note for the Court that the monies that have been paid so far have been paid at the end of the month.
THE COURT: I didn't state the commencement date and I had a note to myself to ask you where you were in payments when we were done with this, so we can address that now.
ATTORNEY OPOTZNER: Your Honor, it's my understanding — correct me, if I'm wrong — that the payments were made at the end of the month, so the next payment should be made as an advance payment for the month of November, am I correct?
THE COURT: Okay. So you're not paying backwards?
ATTORNEY OPOTZNER: No.
CT Page 14307 THE COURT: In other words, the October 31 payment is not for October but it's for November?
ATTORNEY OPOTZNER: You're right, because Judge Mihalakos made an order November 25 of '97.
THE COURT: That's fine. It wasn't clear to me on the record —
ATTORNEY OPOTZNER: Right.
THE COURT: — and I had that as a question. Then, the order should take effect on the last day of the month going forward. In other words, I don't want the parties to have to go through a shifting. It's not significant enough. So when Dr. Schmierer makes his payments on October 31, he'll make payments under the dissolution orders.
ATTORNEY OPOTZNER: So just to clarify, it would be — the alimony and support would be made on the last day — starting the last day of October — the date of October 1999 in advance, is that correct?
THE COURT: Yes, that's fine. Attorney Posmantier, here's your orders.
ATTORNEY POSMANTIER: Thank you, Your Honor.
THE COURT: Attorney Shah got them out for you.
ATTORNEY OPOTZNER: Judges another question that I had was — and this may be presumed — but when you indicated that there would be a payment of half of the unreimbursed medical bills for the children, you did not simply state that that ended when the child support ended. I presume that was your intention as well?
THE COURT: The parties only have a legal obligation during the parties' minorities.
ATTORNEY OPOTZNER: I'm sure you meant that. I just —
THE COURT: Yeah, that's fine. Yeah.
ATTORNEY OPOTZNER: Okay. The next question I had, Judge, was when you mentioned the life insurance — and I'm sure it was inadvertent — I think you said a few times one thousand one CT Page 14308 hundred and fifty —
THE COURT: One million one hundred and fifty —
ATTORNEY OPOTZNER: Okay.
THE COURT: — thousand. You know, you looked at me and I couldn't figure out why because my brain was hearing what I meant to say. Thank you.
ATTORNEY OPOTZNER: You said not to interrupt you so I did not.
THE COURT: And that's fine. The record should reflect that the face amount and aggregate is one million one hundred —
ATTORNEY OPOTZNER: Okay.
THE COURT: — and fifty thousand. Thank you, Mr. Opotzner.
ATTORNEY OPOTZNER: Then, my question in that regard, Your Honor, is one of the life insurance numbers, looking at page ten of our affidavit, involved a group policy, which was one point five times salary —
THE COURT: But not to exceed six hundred thousand —
ATTORNEY OPOTZNER: Right.
THE COURT: — if I remember correctly.
ATTORNEY OPOTZNER: Now, my question was — when you — when you stated that he had to maintain the one point five million before the reduction of five years —
THE COURT: It included the group.
ATTORNEY OPOTZNER: — is it your —
THE COURT: I'm sorry. I was interrupting you but I wanted you to know it included his group.
ATTORNEY OPOTZNER: Okay. Now, the question is — if, for some reason, the group policy isn't available or you determine it from his employment, you didn't state what would happen then. CT Page 14309
THE COURT: You notice I referenced the Lake decision —
ATTORNEY OPOTZNER: Yes, Your Honor.
THE COURT: — and I talked about present insurability and present affordability —
ATTORNEY OPOTZNER: Yes, Your Honor.
THE COURT: — and we know that life insurance is tied to alimony and support and I didn't make any of the amounts nonmodifiable?
ATTORNEY OPOTZNER: Yes, Your Honor.
THE COURT: Okay. Does that answer your question? I mean, I was aware of that as an opt, but I can only deal with what I have now. I assume he would seek a modification at that point.
ATTORNEY OPOTZNER: Okay, Judge, I just wanted to clarify —
THE COURT: That's not a property interest, per se.
ATTORNEY OPOTZNER: Okay. Judge, I have a few more, if I might?
THE COURT: Hm-hmm. Go ahead.
ATTORNEY OPOTZNER: This is one that my client caught that I did not so I may be misstating it.
THE COURT: Go ahead. Take a second to speak to him, if you want, just to be clear on it.
(Whereupon, there was a brief pause in the proceedings.)
ATTORNEY OPOTZNER: Judge, you made reference to a CD, which I believe was part of the —
THE COURT: The nine thousand dollar CD?
ATTORNEY OPOTZNER: Right. According to Dr. Schmierer, in looking at the affidavit, the CD, he says, is four thousand four hundred and forty-two, not nine thousand dollars. CT Page 14310
THE COURT: It was — the parties' affidavits were unclear whether they were each claiming a half or each claiming the whole. It's on both parties' affidavits. It was the intent to take that entire CD and segregate it to the tuition accounts.
ATTORNEY OPOTZNER: Okay. It would be —
THE COURT: Okay.
ATTORNEY OPOTZNER: — my understanding is that it's only the — whatever the — four thousand five (sic) forty-two as of 8/31/99 — it's —
THE COURT: Attorney Posmantier, do you agree that it's a four or five thousand dollar CD and not a nine thousand dollar CD?
ATTORNEY POSMANTIER: I do, Your Honor.
THE COURT: All right. The finding should reflect that and be modified to that but the CD remains a tuition account CD, okay.
ATTORNEY OPOTZNER: And, also, just to clarify, that's an account that's just in Dr. Schmierer's name. I'm sure that wouldn't affect your order, but that's —
THE COURT: No, but I instructed that they be made tenants in common on that and on the Galaxy Money Market, okay.
ATTORNEY OPOTZNER: Okay.
(Whereupon, there was a brief pause in the proceedings.)
ATTORNEY OPOTZNER: There's a question about the Artisan's account.
THE COURT: Which I've segregated to Dr. Schmierer. I believe it's on Ms. Schmierer's financial. That's my recollection but I'm — you know, there were a lot of accounts for me to keep in my head.
ATTORNEY OPOTZNER: Well, his question is — and I didn't pick this up — and perhaps he can address the Court on that issue.
THE COURT: Only if you want him to. CT Page 14311
ATTORNEY OPOTZNER: Yes, I would.
THE COURT: Yes, sir.
ATTORNEY OPOTZNER: Doctor, would you explain that issue?
DR. SCHMIERER: Thank you, Your Honor. On my notes, you had listed the Artisan's under the plaintiff but when you segregated the accounts that were listed for the children, I believe you put it under Mrs. Schmierer's name — one Strong and Artisan's to her and —
THE COURT: I'll read you what I have on Artisan's and I know these are right cause I triple checked them so let me just — we'll do what I've got here.
Artisan Fund is to go to you, sir.
DR. SCHMIERER: Okay.
THE COURT: Okay, and the record should reflect that. Is everyone clear on that? Okay, and to the extent that the orders need to be modified to reflect that, the Artisan Fund goes to the plaintiff absolutely.
DR. SCHMIERER: Thank you, Your Honor.
ATTORNEY OPOTZNER: Are those your two questions?
DR. SCHMIERER: Yes.
ATTORNEY OPOTZNER: Okay, and I had one more, if I could, Judge?
THE COURT: Go ahead, Mr. Opotzner.
ATTORNEY OPOTZNER: When you said — and, again, I'm being technical — but when you said that the duration of alimony would be nonmodifiable, I presume unless sooner terminated by the other factors the Court listed, is that correct, Your Honor?
THE COURT: That's true. I thought I said that but that's fine.
CT Page 14312 ATTORNEY OPOTZNER: Judge, until I see the transcript, that's the best I can do in terms of comments.
THE COURT: It's fine though. Mr. Posmantier, you think —
ATTORNEY POSMANTIER: I do.
THE COURT: — I missed anything, sir?
ATTORNEY POSMANTIER: Just very few, Your Honor.
THE COURT: Go ahead.
ATTORNEY POSMANTIER: The — I know we've now said it probably four times — the life insurance amount — there was some confusion.
THE COURT: Okay. The record should reflect the following — that the face amount and aggregate at the present time is one million one hundred and fifty thousand, okay. Does that do it?
ATTORNEY POSMANTIER: Yes, Your Honor.
THE COURT: Okay.
ATTORNEY POSMANTIER: Thank you, I thought I had heard Mr. Opotzner say one million five hundred thousand and that confused me so —
ATTORNEY OPOTZNER: No.
ATTORNEY POSMANTIER: Okay.
ATTORNEY OPOTZNER: One million one hundred fifty thousand.
THE COURT: Okay.
ATTORNEY POSMANTIER: Got it now, and, then, Your Honor, with regards to the accounts that are being designated to the defendant, I was writing as fast as I could and I got lost.
THE COURT: Okay. On the stocks, bonds and mutual funds or on the 403-B?
ATTORNEY POSMANTIER: I have — I have Lincoln Life and, then, CT Page 14313 I got lost.
THE COURT: Okay. There are two Lincoln Lifes, just so you know. Both of — and the 403-B. Both of those are going to your client. Her own IRA is going to her. Dr. Schmierer's Keogh with Fidelity Mutual is going to her. I'm not giving you the amounts right now. I'm just giving you the names of the accounts.
Of the listings of the stocks, bonds and mutual funds: Fidelity Mutual Fund — T050537202; Strong Fund — 0323200149274; T. Rowe Price — 1012791487; Mutual Beacon — 779185711. Okay?
ATTORNEY POSMANTIER: Thank you, Your Honor.
THE COURT: You're welcome.
ATTORNEY POSMANTIER: The last issue is that on the amended complaint, I believe — I believe it's just the amended complaints, the — Miss Schmierer had requested a name change to her maiden name.
THE COURT: I saw that and I always save that for last because I want to make sure — people change their mind, back and forth a thousand times and I just want to know, ma'am, sitting here today, do you wish the restoration of your birth name?
MS. SCHMIERER: Yes.
THE COURT: Okay. Now, your birth name was Ruth and I know that you have gone by Shoshannah. Have you made formal name change or simply adapted your Hebrew name?
MS. SCHMIERER: That is formal.
THE COURT: Okay. So there's a Court somewhere that has Shoshannah. So if I accept it as part of my orders, I'm not anew giving that to you as a matter of law, is that right?
MS. SCHMIERER: Correct.
THE COURT: Where was that done, ma'am?
MS. SCHMIERER: In Boston.
THE COURT: At a Probate Court or something? CT Page 14314
MS. SCHMIERER: Yes.
THE COURT: Okay.
MS. SCHMIERER: I had to go there. They published it in the newspaper.
THE COURT: All right, and do you have a middle name?
MS. SCHMIERER: No longer.
THE COURT: Okay. So it's Shoshannah Zimmerman. Your birth name is so restored as a matter of court order. Thank you.
ATTORNEY OPOTZNER: Judge, I have one more question, if I might. Are you done?
THE COURT: Well, let me — are you done, Mr. Posmantier?
ATTORNEY POSMANTIER: I had a question but I needed to see the papers that are in Mr. Opotzner's hand and he said he needed to ask a a question —
THE COURT: Okay.
ATTORNEY POSMANTIER: — before I saw them.
THE COURT: Go ahead.
ATTORNEY OPOTZNER: I just want to clarify, because when your accounts that were going to Dr. Schmierer, I don't recall you specifically saying that the Fidelity Brokerage account, which is the one that's a part of the six thousand one hundred dollars in account 1572 —
THE COURT: It was intended to go to him less the six thousand one hundred.
ATTORNEY OPOTZNER: Okay, and you implied that later on but you didn't —
THE COURT: Yeah. Okay.
ATTORNEY OPOTZNER: — say it initially. CT Page 14315
THE COURT: Okay.
ATTORNEY OPOTZNER: That's in —
THE COURT: Yes, and that was intended. Thank you.
ATTORNEY OPOTZNER: So it's his?
THE COURT: If I missed it, thank you. It's his.
ATTORNEY OPOTZNER: Okay.
THE COURT: Mr. Posmantier, does that answer your question?
ATTORNEY POSMANTIER: It does not, if I can just take a look at —
(Whereupon, there was a brief pause in the proceedings.)
THE COURT: All right. Cause I've got to go on to other things, counsel. I don't mean to be impatient but —
ATTORNEY POSMANTIER: Your Honor, the issue is with regards to the — I don't need to ask the question.
THE COURT: Okay.
ATTORNEY POSMANTIER: Thank you.
THE COURT: Thank you. Mr. Opotzner?
ATTORNEY OPOTZNER: No, Your Honor. Thank you very much. I need to —
THE COURT: You're welcome.
ATTORNEY OPOTZNER: — you know, see — order the transcript —
THE COURT: Sure.
ATTORNEY OPOTZNER: — and I presume the official order is when you sign off on the — are they divorced as of today's date, Your Honor?
CT Page 14316 THE COURT: The parties are — I was about the explain this —
ATTORNEY OPOTZNER: Okay.
THE COURT: — and talk to them, okay. You folks are — your dissolution of marriage is effective as of today's date. These orders are effective as of today's date so, counsel, that means your twenty days runs from today, not from when I sign the transcript, okay, just so you're very clear on that.
Now, Dr. Schmierer, I just want to know, sir, do you feel you understand these orders?
DR. SCHMIERER: I — yes — two questions but I understand the orders.
THE COURT: Go ahead.
DR. SCHMIERER: There were just two items on my claim — some personal, sentimental items that I — a ring from my grandmother and my old wedding ring.
THE COURT: Your wedding ring I intentionally didn't give you. The ring from your grandmother I intended it to be in the search items for Ms. Schmierer to search and, if I declined to say so, thank you for bringing it to my attention.
DR. SCHMIERER: Thank you, Your Honor.
THE COURT: Okay. So that you search for that, ma'am, and if you can find it, you return it to him just as he's doing for your grandfather's Cartier, okay — watch.
Okay, ma' am, do you understand these orders?
MS. SCHMIERER: For the most part.
THE COURT: Okay. You confident that if you go over it with Mr. Posmantier, he'll answer your additional questions?
MS. SCHMIERER: Yes.
THE COURT: Okay. Thank you very much.
All right, folks, all I can do at this point is wish you good CT Page 14317 luck. I don't know what else to say to you but —
ATTORNEY OPOTZNER: Judge —
THE COURT: — you'll be fine —
ATTORNEY OPOTZNER: I'm sorry.
THE COURT: — both of you. Go ahead.
ATTORNEY OPOTZNER: The amortization booklet — since it's only a judicial notice item, do you need that for the duration?
THE COURT: I'm sorry. I warned you.
ATTORNEY OPOTZNER: Okay.
THE COURT: I did warn you before.
ATTORNEY OPOTZNER: You did warn me, Judge.
THE COURT: Okay. Thank you. we'll recess. Thank you.
(Whereupon, the Court recessed at 12:15 p. m.)
Munro, J.
 SUPERIOR COURT JUDICIAL DISTRICT OF NEW LONDON AT NORWICH AT REGIONAL FAMILY TRIAL DOCKET CERTIFICATION
JEFFREY A. SCHMIERER DOCKET NO. FA96-0326141S VS.
DATE: OCTOBER 12, 1999 SHOSHANNAH SCHMIERER
I, Penny M. A. Schonvisky, Court Recording Monitor, certify that the foregoing is a true and accurate transcript of the proceedings in the above-entitled case, before the Honorable CT Page 14318 Lynda B. Munro.
This is the 19th day of October, 1999.
Penny M. A. Schonvisky Court Recording Monitor